Filed 10/15/21  P. v. Sanchez-Gomez CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IGNACIO SANCHEZ-GOMEZ,<br><br>    Defendant and Appellant. | A156198<br><br>(Contra Costa County<br>Super. Ct. No. 51722081) |

A jury convicted appellant Ignacio Sanchez-Gomez of first-degree murder and four separate counts of attempted murder.  The jury also found true firearm and gang enhancements.  The trial court sentenced appellant to life without the possibility of parole.

On appeal, appellant contends:  (1) his trial counsel was ineffective for failing to object to evidence presented by the prosecutor which the court had earlier ruled inadmissible; (2) the trial court erroneously instructed jurors on how they could evaluate the credibility of one of the prosecution's witnesses; (3) the trial court erroneously instructed jurors that appellant's statements alone were sufficient to satisfy the prosecution's burden of proof on certain issues; (4) the four attempted murder convictions must be reversed because the "kill zone" instruction given was legally erroneous and there was insufficient evidence to support it; (5) the gang special circumstance must be

1

reversed because the trial court incorrectly instructed the jurors it could apply even if appellant was not the one who actually killed the victim; (6) the restitution and assessments against him must be stricken or stayed; and (7) the sentencing and youthful offender parole statutory provisions that make him ineligible for youth offender parole hearings violate equal protection principles.

We reverse the four attempted murder convictions and remand for resentencing and possible retrial on the attempted murder counts as long as any retrial is not based on a kill zone theory. We otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

On September 10, 2017, Adrian S.[1] was shot and killed while at a barbecue with four friends in front of his friend's apartment. The apartment was at 1829 Powell Street, a residential street which runs north to south, in San Pablo. The 1800 block of Powell intersects with Market Avenue to the south and Dover Avenue to the north. East of and parallel to Powell is Mason Street, another residential street running north to south. Much of the police investigation into Adrian's death and many of the witnesses centered on the square block bound by these streets.

As night approached, a man walking alone and wearing a hooded sweatshirt, or hoodie, walked southbound on Powell from Dover towards Market and fired multiple shots in the direction of the barbecue. Adrian was struck, fell to the ground, and died. His four friends—Oscar T., Edwin R., Rohan J., and Jose P.—were not hit. Meanwhile, the lone shooter fled north

---

[1] For clarity, to avoid confusion, and to protect personal privacy interests, we refer to several individuals by their first names. No disrespect is intended.

2

on Powell towards Dover. Shortly after the gunshots, a witness on Mason saw a person turn the corner onto Mason from Dover. At some point, the person was joined by another individual. Witnesses on Mason observed two people running down Mason towards Market. Moments later, one of those witnesses saw someone from the direction the pair had headed return to dispose something in a recycling bin. Surveillance cameras throughout the area captured some of these movements.

From the recycling bin, police found and retrieved discarded clothes which were tested for DNA. The DNA on the clothes matched appellant and his friend Jose Maravilla, and gunshot residue was found on the shorts. Appellant, who lived in an apartment on the corner of Market and Powell— across the street from the crime scene—was later arrested along with Maravilla. Police subsequently found gang-related clothing in searches of their homes, identified their tattoos as gang-related, and clipped social media posts in which they displayed gang signs.

On December 15, 2017, Maravilla and appellant were each charged with one count of murder (Pen. Code, § 187)[2] and four counts of attempted murder (§§ 664/187, subd. (a)). Firearm and gang enhancements were also alleged (§§ 12022.53(d), 190.2(a)(22), 186.22(b)(5)). In June 2018, Maravilla and appellant were jointly tried. The jury was unable to reach a verdict, and the trial court declared a mistrial.

Following the mistrial, Maravilla pled to one count of voluntary manslaughter and one count of attempted murder. The attempted murder conviction included a gang enhancement and a firearm-use enhancement. Maravilla was sentenced to 25 years and 8 months in prison.

---

[2]     All statutory references are to the Penal Code unless otherwise stated.

3

Appellant faced a second jury trial, which began in September 2018. The prosecution's theory of the case was that appellant and Maravilla believed the five men at the barbecue on Powell belonged to a rival gang and conspired to kill them in a gang-motivated attack. The defense theory of the case was that Maravilla was the shooter acting alone or with some other unknown person who was not appellant, and it was not a gang-related shooting.

### B. The Prosecution Case

#### 1. The Crime

Appellant lived with his mother, Maria G., in Apartment 1 at 2345 Market Avenue, an apartment building located on the corner of Market and Powell in San Pablo. Around 5 p.m. on Sunday, September 10, 2017, appellant and Maravilla left the apartment where they had spent the day hanging out, walked to the liquor store across the street, and bought beer. The two of them returned to the apartment and drank.

Meanwhile, across the street in the driveway in front of the apartments at 1829 Powell, Edwin had friends over for a barbecue and beer; Adrian, Jose, Rohan, and Oscar were there. Adrian wore a red Washington Nationals baseball cap and red sneakers. The group watched football, ate, and drank past sundown.

After it got dark, they heard what they initially thought were fireworks. When they realized the sounds were gunshots, Rohan and Edwin dropped to the ground. Neither Rohan nor Edwin could tell where the shots had come from. Jose, whose back was to the street when he heard shots, looked over his shoulder up Powell towards Dover and saw flashes and someone in the street shooting. Because of the darkness, however, he saw only "shadow[s] and flashes." Oscar saw the gunman who shot at his friends.

4

He believed the shooter was wearing a blue hoodie or sweatshirt and was a little shorter than 6'2". Oscar gave chase but the shooter was far from him, and Oscar never caught up. Someone returned fire at the shooter as he fled the scene. Oscar was seen tossing a gun in the bushes near the garage door of his house and then running back to Edwin's place.

After the shots stopped, Edwin, who had been next to Adrian and saw him on the ground, told his friend to get up but got no response. Rohan saw Adrian was hit, had blood on his face, and was not responding to their calls. They attempted to get him into a car to take him to the hospital, but they could not move him.

The first police dispatch was issued at 8:24 p.m., and police arrived soon thereafter. Officers found Adrian on his back "most of the way up the driveway" next to a parked Camry. An officer administered CPR with chest compressions but Adrian was not responsive. He died from a gunshot wound to his head.

Several people in the neighborhood testified about what they saw in the moments before and after the gunshots. Maria B. was getting out of her car on Powell and heading to a friend's house when she saw a man who was about 6 feet tall bring the hood of his sweatshirt over his head and walk south on Powell in the direction of the barbecue. As she walked up the stairs to her friend's house, she heard gunshots. Beatriz T., the friend Maria B. was visiting who lived a few doors down from the shooting, peeked out her window after she heard the gunshots and saw "somebody running super fast in front of the house with their hood[ie] pulled so it . . . completely covered, their face." The person was running towards Dover.

Deshawn B. was just about to step out of his friend's car in front of his house on Mason when he heard the gunshots. He rushed to get inside, but

5

before entering turned around to make sure his friends safely departed. At that point he saw someone turn onto Mason from Dover headed towards Market. The lone person was running with his or her head down and hood on.

Edward C. was on his balcony on Mason and heard the gunshots. About five minutes later, he saw two guys running by towards Market. One was taller than the other. The taller one "had to be 5'11, almost 6'," and the shorter one was around 5'4". The taller one may have been wearing a hoodie but the hood was off and he saw he had shoulder-length hair, and he was possibly wearing shorts. He lost sight of them after they turned the corner. Omar Z., who also lived on Mason where he had installed a surveillance system, testified that he was cleaning his garage when he heard the gunshots. He also saw two people running on Mason towards Market.

Edward added that, five minutes after he saw the pair run past him, someone returned from the direction the pair had headed. The person had a hoodie on and was carrying something covered in a shirt—"a shirt, blanket, or some sort of cloth material just bundled up"—that he dropped in the recycling bin placed curbside for pickup. That person "looked like a totally different person" than the two people he had earlier seen running.

### 2. Police Investigation

Officers located 15 total shell casings at the crime scene clustered in two different locations. Six silver casings were spread out on the driveway of 1829 Powell, and nine brass casings were found on the north end of Powell. Officers also located evidence of six spent bullets. Of the four found in the driveway area, three had been found in the parked Camry. The fourth was located on the ground next to the Camry's driver's side rear tire and appeared to be stained with blood. At the neighbor's house, there was a bullet hole

6

through the garage door and an expended bullet underneath the stairs going into the house.

An officer pulled surveillance video from the liquor store about a block from appellant's apartment building. The video showed two men—appellant and Maravilla—coming from Market enter the liquor store shortly after 5:00 p.m. There is no dispute that the two men were appellant and Maravilla. One of them wore a white tank top. Other surveillance video also showed appellant and Maravilla go back in the direction of appellant's apartment building carrying beer. Video from the shop's exterior camera, which pointed directly at Edwin's apartment building, showed muzzle flashes and contained audio of two separate volleys of gunfire at 8:24 p.m.

Surveillance video from a camera with a clear view of appellant's apartment building showed someone wearing a white tank top leaving the apartment, standing outside, then walking back in at 7:40 p.m. Other video showed two people leave the apartment and walk eastbound along Market at 8:19 p.m. One of them was wearing shorts and a white tank top. The one wearing the shorts was much taller than his companion. The video showed someone walking westbound on Market and enter the apartment building at 8:25 p.m. The video further showed someone leave the apartment at 8:28 p.m. and walk eastbound on Market holding a bag.

Another officer pulled surveillance video from Omar's house on Mason. This video showed two people walking north on Mason at 8:19 p.m. The video also showed two people—one on the sidewalk and the other on the street—running southbound on Mason towards Market at 8:23 p.m.

Additionally, officers collected a white tank top and gray shorts from the recycling bin into which Edward saw someone drop items. The items were sent to the crime lab for testing. The shorts tested positive for gunshot

7

residue. This meant the shorts "were either near the discharge of a firearm or were in contact with another item that was near the discharge of a firearm." In addition, DNA matching Maravilla was found on the shorts and the tank top, and DNA matching appellant's DNA was found on the shorts.

Based on the DNA, gunshot residue, and "multiple witnesses saying that [appellant] was involved," the police investigation focused on appellant and Maravilla. Officers conducted surveillance of both suspects. While monitoring a house in Richmond connected to Maravilla, they saw that Maravilla had shaved his head, in contrast to the long hair he had in previous photos taken a month earlier. Their two surveillance attempts of appellant at his apartment were unsuccessful, and officers never saw him there.

### 3. Arrests

On September 28, 2017, appellant and Maravilla were arrested and brought to the San Pablo police station. Each of them was separately interviewed by officers and shown clips from surveillance video officers had collected. They were transported to jail in a van wired with listening devices and their conversation was recorded.

### 4. Maria G. (Appellant's Mother)

On the day of the arrests, officers interviewed appellant's mother, Maria G. According to one of the interviewing officers, Maria G. told them appellant goes by the nickname "Triste." She said appellant was with Maravilla at the apartment on the evening of September 10, 2017, and the two of them left about 8:00 p.m. He said they would be right back but he never returned.

The prosecution also called Maria G. as a witness at trial. She testified that on the day of the shooting appellant was at the apartment with

Maravilla. Her older son Ricardo S. came by to visit. Later in the day, Maravilla also came over. At some point during the day Ricardo left, but it is not clear whether he left before or after Maravilla arrived.

Maria G. saw appellant and Maravilla drinking outside. She did not remember the two leaving the apartment but acknowledged that she told the police that they left together sometime around 8:00 pm. After appellant left that evening, she did not see him for a while. In the 18 days after the shooting, appellant never came back to the apartment. He had never been gone for that long before.

On cross-examination, Maria G. testified that appellant and Maravilla never told her they were leaving. However, she knew they had gone out because she left to take out trash and they were not there. She did not see them leave and did not know when they left. She could not remember Ricardo being at the apartment that day. She agreed that Maravilla was pretty good friends with Ricardo and hung out with him more than appellant.

### 5. Gang Evidence

Police searched both appellant and Maravilla's residences. At appellant's apartment, officers found what they believed to be gang-related baseball caps. One had " 'VFL Sadboy' " written on it, and another said " '113 percenter.' " At Maravilla's place, officers found gang-related writing. A door frame leading to Maravilla's bedroom had the phrase "Norte Killa" written on it. Other phrases found in the house included " 'Fucka Busta,' " " '187,' " and " 'Fucka snitch.' "

Detective Tyler Hannis, a member of the San Pablo Police Department gang unit, was very familiar with the Sureño criminal street gang and with the gang's subsets, VFL, or Varrio Frontero Loco, and RST, or Richmond Sur Trece. He testified as an expert on these gangs. The Sureños are controlled

9

by the Mexican Mafia prison gang. For this reason, Sureños associate themselves with the number 13, which stands for the letter "M," the 13th letter in the alphabet. They display variations of the number, such as X3 or XIII or a symbol of three dots above two lines. Members say they give "113 percent" when going above and beyond to further the gang. They use the words "Sure[ñ]o" or "Sur" or the letter "S" as symbols and wear the color blue, which is the gang's main color and wearing blue shows a member's pride within a gang. The Sureños' longtime rivals are the Norteños. Norteños wear red and associate themselves with the number 14. Norteños also have local subsets, such as the North Side Locos, or NSLs, and Varrio San Pablo, or VSPs. Sureños describe Norteños as "bustas" or "chaps" to disrespect them, and Norteños refer to Sureños as "scraps" to demean them.

Once someone becomes a Sureño, he will go out and do acts to further the gang. The more violent the act, the more valued the individual will be within the gang. For instance, someone who spray paints the gang symbol on a wall has some value to the gang, but someone who shoots a rival gang member will be valued more highly. Within the gang, the violence and fear gang members instill in the community is valued.

Tattoos are common among Sureños. A gang-specific tattoo demonstrates one's association with and lifelong commitment to the gang. Tattoos specific to a subset show pride in that specific set. Tattoos also provide a way for a gang member to gain respect from other gang members or instill fear in rival gangs. When a gang member commits an act of violence, he adds a tattoo. The more valued and more violent, the more tattoos he may have. It is uncommon for someone not in the gang and who has not earned a tattoo to get a gang tattoo. True gang members would find someone's

unearned gang tattoos disrespectful and could assault or even kill a non-gang member who improperly tattooed himself.

The Sureño subset VFL has approximately 20-25 members and is centered around North Richmond. It also draws members from San Pablo, which is geographically close to North Richmond. In addition to the symbols and signs used by Sureños generally, VFL members commonly use the letters "VFL" as a sign. The letters are also incorporated into a hand sign that gets exhibited in pictures to show their association. The Sureño subset RST occupies the part of Richmond on the south side of San Pablo. RST members use "Richmond Sur Trece" or "RST" as symbols unique to them, and they tattoo themselves with those words and letters to identify themselves as members. They also have a distinct hand sign.

The VFL and RST subsets currently get along. As the two subsets occupy similar territory, the members of both subsets will at times commit crimes together. On several occasions, Hannis observed gang members from each set commit crimes or acts of violence together. This shows the unity between the two gangs and increases the respect and fear of the sets. VFL's primary activities include vandalism, assaults, shootings, and murder. They also engage in weapons-related crimes and drug-related crimes. RSTs engage in the same conduct. Both VFL and RST were active gangs on the day Adrian was killed. According to Hannis, the area where Adrian was shot did not belong to any specific gang or subset and would be considered neutral territory.

The prosecution presented evidence that appellant had several tattoos. In Hannis's view, appellant's tattoo of three blue stars was gang-related because of the color and the number of stars, which connected to the number 13. Similarly, appellant's tattoo of a dollar sign was gang-related because it

11

resembled an "S" and one of the ultimate goals of the gang was to make money to further the gang. The tattoo on appellant's right hand with the letter "N" crossed out and the tattoo on his left hand with the letter "K," taken together, signified "Norteño killing" or "Norteño killer." Appellant's left hand also had a tattoo of an AK-47 assault weapon which showed the importance of firearms within the gang culture. A tattoo of "VFL" on appellant's forearm stood for Varrio Frontero Loco, the Sureño subset.

The prosecution also presented evidence of photos from appellant's "Sadboy Sanchez" social media account, which Hannis viewed. One photo posted in February 2017 showed appellant wearing a blue hat, blue t-shirt, and blue rosary and holding up the VFL sign. Another photo captioned " 'Gang' " showed appellant wearing blue jeans, a blue hat, and blue shoes, holding up the VFL sign with his right hand, and the number three with his left hand. Hannis described the "113 percent" hat found at appellant's apartment to be a gang related Sureño hat. The hat with "VFL Sadboy" written on it referenced appellant's street name, Triste, which means sad in Spanish.

In Hannis's opinion, appellant was a member of a the Sureño criminal street gang on September 10, 2017. He further asserted that appellant was part of the VLF subset of the Sureños. Based on Maravilla's tattoos, his actions with other known gang members, the items in his residence, Hannis opined that Maravilla was also a member of the Sureño criminal street gang on September 10, 2017. However, Hannis had no basis to opine that Maravilla was a member of the VFL subset. Hannis also researched whether Adrian was a member of a criminal street gang but found no such information. He also researched whether Adrian's friends at the barbecue were gang members, but found no information indicating they were.

12

Hannis stated that if a VFL gang member killed someone who is merely perceived to be a rival gang member based on his clothing, that would still further the reputation of the gang. The VFL's reputation would be enhanced and fear among rival gang members would increase. It would also promote the individuals who committed the crime and elevate their status within the gang. If two Sureños from different subsets killed together, both of their reputations within the gang would be boosted.

On cross-examination, Hannis acknowledged that he was unaware of any gang members claiming responsibility for Adrian's shooting on social media. There was no gang graffiti in the area and no indication the shooter made any gang-related statements or announced his gang before, during, or after the shooting.

## C. The Defense Case

The defense theory of the case was that the shooter was Maravilla acting alone or with some other unknown persons who could have been appellant's brother, Ricardo. The defense sought to establish the prosecution's theory of guilt was not consistent with appellant's character for non-violence.

### 1. Ricardo's Testimony

The first defense witness called was appellant's older brother Ricardo. He admitted he was a Sureño and a member of the RST subset. His brother, on the other hand, was not part of RST, had never been initiated into the VFLs and was never an active gang member. Rather, appellant was a hard worker and was always working. Moreover, appellant was not a violent person. Ricardo had never known his brother to get into a serious fight. The tattoos, which the state portrayed as gang-related, were done a "long-ass time ago." Ricardo also acknowledged that Maravilla was an RST member.

Ricardo said that he saw Maravilla more than his brother and they sometimes spoke on the phone. He did not think Maravilla and his brother were close friends and had never seen them hang out. As for the day of the shooting, he said he was at his mother's apartment earlier in the day but left while it was still daylight. He denied accompanying Maravilla around the block to shoot Adrian. He did not remember where he slept that night.

On cross-examination, Ricardo acknowledged that he did not know whether his brother was a VFL. He agreed that within the Sureños tattoos had to be earned. He also acknowledged that if someone wore a Sureño tattoo without being a member or earning it he could be subject to physical violence.

### 2. Character Witness Testimony

Additional family and friends testified as to appellant's nonviolent character. None who were asked had ever seen or heard of appellant ever getting into arguments or fights with anyone.

Several witnesses either acknowledged or heard that appellant was a gang member and a few knew he belonged to VFL. His gang membership, however, did not or would not change their opinion of his character. Most were also aware of his gang-related tattoos, but these too did not change their opinion of his nonviolent nature. Appellant's cousin Gerardo G. noted that he got his tattoos when they were "pretty young . . . like 17 or 18 years old." Gerardo also did not believe appellant was an active gang member because he was busy working and spending time with family.

Cousin Cristian S. was at appellant's apartment the afternoon of September 10, 2017, playing video games with his female cousins. He left around 6 or 6:30 p.m. He saw appellant outside that day with another person he had seen around before. He did not see Ricardo there that day.

14

### 3. Employer's Testimony

Jack M., the owner of two eateries on San Francisco State University's campus, testified that appellant worked for him full-time for a couple of years, providing "all-around help"—bussing, dishwashing, and stocking. Appellant worked well with the approximately 35 other employees, and Jack never saw any issues between him and his co-workers or customers. He was never a problem.

### 4. Edith M.'s Testimony

After the court found Edith unavailable, her testimony from the first trial was read into the record. Edith was Adrian's best friend's girlfriend. According to Edith, about a week before the shooting, she went to pick up her boyfriend from a spot near appellant's apartment. Ricardo and another person stared at her and her boyfriend in a threatening manner while they were in their car on Market. A man she believed to be Ricardo got into an SUV with a companion and followed her and her boyfriend closely for several blocks. They gave her a threatening stare that scared her. After telling police about the incident, she was shown a photographic line-up in which she identified Ricardo as the person who followed her and her boyfriend shortly before Adrian was shot. She did not recognize appellant or Maravilla at all.

### 5. Defense Gang Expert Testimony

Dr. Jesse De La Cruz testified as the defense's gang expert. According to Dr. De La Cruz, someone who lives in a dangerous area might reluctantly join a gang and get tattoos as a means of protecting themselves. The tattoos might be intimidating to the general public so that others will not attack them, but in reality the person may not be violate or want to be in a gang at all. Someone can get a gang-related tattoo at an early age but then "age out" and distance themselves from the gang around age 24 or 25. Someone with

gang tattoos is also able to drop out of the gang. In his view, gang tattoos did not indicate a pledge of lifelong affiliation to the gang. Dr. De La Cruz distinguished between active gang members who are involved in consistent prolonged criminal gang activity with those who simply have an affiliation with the gang but are not committing crimes. Holding the same full-time job for months and having a reputation as nonviolent or kind would be inconsistent with an active gang member.

He also explained that a gang member may do a criminal act but not for the gang. When a crime is committed for the gang, he will yell out the name of the gang, throw up his gang's hand signs, or post on social media about the crime to take credit. Based on his extensive experience around gangs, he observed, "The idea that gang members go out and kill people to get a reputation is sort of absurd a little bit. . . . Sometimes it happens, but primarily it doesn't." He further added that it would be rare for gang members of different subsets to commit serious crimes together. There would also be no prestige in assaulting an individual who had no gang affiliation.

Based on appellant's work history and record, Dr. De La Cruz opined that appellant was a VFL gang member at the time of the shooting but was not "actively involved" in the gang's criminal activity. He noted that the tattoos on appellant's face did not reflect an active gang member, but rather someone who put tattoos on early in life and regretted it.

### 6. Additional Defense Evidence

Omar's testimony from the first trial was read to the jury.

Appellant did not testify.

### D. Stipulated Evidence

The parties stipulated that, "if called to testify, Oscar [T.] would testify that: [¶] One, he saw a person who fired into the group standing near him;

16

[¶] Two, the shooting was unprovoked; [¶] Three, he believes the shooter wore a blue hoody, a blue sweatshirt that might have been Warrior blue; [¶] Four, the suspect was a little shorter than Oscar . . . , who is about 6 feet, 2 inches tall, and skinny. [¶] Five, the suspect was pretty far from him when he chased after him."

### E.    Verdict and Sentencing

On October 23, 2018, after two days of deliberations, the jury reached its verdict. The jury found appellant guilty on all counts and the enhancements true. For the murder conviction, the trial court sentenced appellant to life without the possibility of parole (LWOP). For the four attempted murder convictions, the court imposed four LWOP sentences to be served concurrently. He was also ordered to pay restitution and assessments. Exercising its discretion under Senate Bill No. 620 (Stats. 2017, ch. 882, §§ 1-2), the court struck the section 12022.53, subdivision (b), (c), and (e)(1) firearm enhancements. This appeal followed.

## DISCUSSION

### A.    Ineffective Assistance of Counsel

Appellant argues that his trial counsel's failure to object when the prosecutor introduced identification evidence which the court had already ruled inadmissible constituted ineffective assistance of counsel.

### 1.    Additional Facts

One of the surveillance videos police obtained from the night of the crime showed two people walking north on Mason toward Dover at 8:19 p.m. before the shooting occurred. The video also showed two people running south on Mason towards Market at 8:23 p.m. following the shooting.

Defense counsel filed a motion in limine to bar any witness from opining on the identity of anyone in the video. Specifically, appellant

17

requested that "the court bar any witness from opining that the shorter runner in the videos is Ignacio Sanchez-Gomez—at least without some foundation that such opinion would be helpful to the jury. The jury is at least as capable of a lay witness to determine the identity of a person in a surveillance video." Defense counsel explained the videos were taken at night, had blurred images, and showed "very fast-moving shadows." He further noted there were no facial images in any of the videos, "just figures moving rapidly in the dark."

The trial court granted the defense request and explained: "I would agree with [defense counsel], that [the identification] is something that the jury can do as well as a witness can do. So unless it was somebody who knew the defendant personally like his family member who has known him all of his life [and] might be in a better position to identify him. But if it's a police officer or someone who does not have that personal connection with the defendant, then their opinion as to who is in the video is no more valuable than the jurors'." The court said the identity of that person will "be up to jury to decide."

At trial, several surveillance videos were admitted into evidence and shown to the jury, including the video showing two people moving northbound on Mason at 8:19 p.m. and southbound on Mason at 8:23 p.m.

As discussed, Omar, who lived on Mason and whose surveillance video the police had obtained as evidence, was called as a witness for the prosecution. On the evening of the shooting, he was working in his garage. After he heard the gunshots, he saw people run by towards Market. Prior to testifying, Omar watched on a computer surveillance videos that had been taken from his home surveillance system. He agreed that the videos depicted the same two people he saw run by his house towards Market:

18

"Q. When you watched them on the computer, did you recognize an individual in the court that you saw – that you recognized to be in the video?"

"A. Yes."

"Q. Who did you recognize in court as being one of the individuals in the video?"

"A. One that has a tattoo here (indicating)."

The prosecutor asked the record to reflect that appellant was the only one in the room with a tattoo where Omar indicated, and thus identified appellant. In response to the court's inquiry, defense counsel indicated he had no objection to the reference to the tattoo. The court then confirmed that Omar identified appellant. Omar continued that he remembered the height and the clothing of the runners. They had "loose clothing like gang members, like cholos." They were of different heights—appellant, who Omar estimated to be 5'5" or 5'6," was the shorter of the two. The taller one was around 5'7." Asked if he could tell the types of clothing the pair were wearing, Omar said no.

On cross-examination, Omar acknowledged that he testified about the shooting in an earlier proceeding. He explained that, at the prior proceeding, one video had been projected on the wall and was not clear. When he watched the videos on the monitor, however, he could see that appellant was the shorter man on the video. Also, at the prior proceeding, no one asked him to identify either of the defendants. When asked later if he was asked if he could identify either of the defendants, he did not remember.

Omar also discussed his witness interviews with police after the shooting. The initial interview occurred between a few days and a week after the shooting and did not last long. He told police he saw two people running past his house. The officer, however, did not ask many questions about how

19

they looked or whether he could describe what they looked like. Days later, an officer or detective returned and asked Omar for a description of the two men who ran by his house. He told them one was tall, the other was short, and both were plump. He told police the shorter one ran by first, followed by the taller one. In addition, the taller one had long shoulder-length hair. When asked about their clothing, he said they wore blue jeans, one had a "brownish shirt, the other one a whitish," and that they both wore hoodies. He was unable to tell officers about any other details of their clothing. Omar was asked by police if he could recognize their facial features, but he never mentioned anything about a tattoo because "[t]hey didn't ask me many things. Only where I was, what I was doing, and how they looked like." Later, he said he told police about a tattoo, as well as defense counsel.

On redirect examination, Omar explained that shortly after the shooting defense counsel had visited him and asked if he could identify the perpetrator in a book containing dozens of photographs. He did not recognize anyone. At that point, Omar told defense counsel that he saw a facial tattoo on the person running. He also stated that he had never been asked whether he recognized the defendants in the first proceeding. As to that proceeding, he explained the surveillance video he looked at was projected on a wall. According to Omar, "it was clear" watching the videos on the computer monitor, and "[he] saw [appellant] closer and clearer." Asked if there were any features he recognized, Omar responded, "No, the whole package."

On recross-examination, Omar agreed it was after he was shown the surveillance videos by the prosecutor (before his testimony) that he concluded appellant was one of the people in the video. He could not see the tattoo on the video. He also added, "I saw him when he went in front of my house, live.

20

[¶] I saw the tattoo the first time the person went in front of my house and then I recognized him when I saw him here, after watching the videos."

The parties agreed that Omar's testimony from the first trial could be read into the record. At the first trial, Omar testified that after the gunshots, he "saw two people that went by running" towards Market. He could not see them well because he was working on his car under a tent and "didn't really pay close attention." He also stated that he was able to see the runner in the back better than in the front. Both were wearing loose "cholo clothing." The second runner was the taller one, and he had blue pants and a "shirt that was sort of brown." He was "full" and chubby, had long shoulder-length hair, and coughing and holding his pants up as he ran.

### 2. Applicable Law

A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. "The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' " (*People v. Gray* (2005) 37 Cal.4th 168, 207.) If the second prong of prejudice

21

is not established, the court may reject the claim without analyzing the first prong. (*People v. Kipp* (1998) 18 Cal.4th 349, 366–367.)

Ineffective assistance claims may be raised and decided on direct appeal, and they can be found meritorious when the record reveals that counsel did not or could not have a reasonable strategic reason for the challenged action or inaction. (See, e.g., *People v. Fosselman* (1983) 33 Cal.3d 572, 581.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (*Mendoza Tello*).) "Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

### 3. Analysis

Here, appellant has not demonstrated that his counsel's performance was objectively unreasonable. Where an ineffective assistance of counsel claim is based on trial counsel's failure to make a motion or render an objection, a defendant must prove not only the absence of a reasonable tactical explanation for the omission but also that the motion or objection would have been meritorious. (*People v. Mattson* (1990) 50 Cal.3d 826, 876; *People v. MacKenzie* (1995) 34 Cal.App.4th 1256, 1272.) "An attorney may choose not to object for many reasons, . . . the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

Notwithstanding the trial court's in limine ruling, appellant has not shown that trial counsel acted unreasonably in failing to object to Omar's identification testimony. A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800; see also *People v. Mixon* (1982) 129 Cal.App.3d 118, 128.) " '[T]he identity of a person is a proper subject of nonexpert opinion.' " (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).) *Leon* acknowledges the line of appellate "decisions [that] have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Id.* at pp. 600–601.) Under this authority, Omar's identification was proper.

Appellant contends Omar's identification was improper because it was based on video, not on personal knowledge he had from associating with appellant prior to the night of the crime. We disagree. The defendant in *Leon*, *supra*, 61 Cal.4th 569, similarly argued that an officer's testimony identifying him on surveillance video was not admissible because the officer had no contact with him before the crimes. (*Id.* at p. 600.) The Supreme Court rejected the argument explaining the timing of an officer's interaction with a defendant raised "a distinction without a difference" when it came to being able to identify the defendant in a video. (*Ibid.*) The court focused on the fact that the officer "was familiar with [the] defendant's appearance around the time of the crimes," having contacted the defendant the day after the crime. (*Ibid.*) Here, Omar's interaction with appellant was no less significant than the witness in *Leon*. He did not merely identify appellant from the surveillance video, but was also an eyewitness in the neighborhood on the night of Adrian's murder. From his garage, he saw the two runners pass his house shortly after the gunshots. He testified, "I have seen him

23

before when he ran in front of the house." He noted he saw appellant's facial tattoo "the first time the person went in front of my house." That provided him adequate knowledge of appellant's appearance at the time the video was taken. Further, any questions about the extent of Omar's familiarity with appellant's appearance "went to the weight, not the admissibility, of his testimony." (See *ibid.*)

Appellant also argues that "there is little doubt that the trial court would have sustained a timely objection from defense counsel on [Omar's] identification testimony," focusing on its pre-trial ruling barring any witness from opining on the identity of the shorter runner in the surveillance video. We disagree. Appellant's in limine motion granted by the trial court specifically referred to witnesses testifying "without some foundation." As just explained, Omar had a foundation for identifying appellant. Since appellant has not shown his trial counsel's failure to object to Omar's identification testimony was objectively unreasonable, we need not consider whether he suffered prejudice.

## B. Instructional Errors

### 1. Standard of Review

"We review instructional error claims de novo." (*In re Loza* (2018) 27 Cal.App.5th 797, 800.)

"In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) We evaluate whether an instruction is misleading by reviewing the jury charge as a whole. (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1237

24

(*Campos*).) " ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) We also assume jurors are intelligent people capable of understanding and correlating all the court's jury instructions. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 493.)

If we determine there was an instructional error, we then assess whether a reversal is warranted because the erroneous instruction was prejudicial. (*People v. Baratang* (2020) 56 Cal.App.5th 252, 259.) For state law instructional error, harmlessness is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836–837. (*People v. Flood* (1998) 18 Cal.4th 470, 483 & fn. 9.) Reversal is warranted if "there is a 'reasonable probability' there would have been a result more favorable to the defendant absent the error." (*Ibid.*) When a defendant claims instructional error based on a legally inadequate theory of guilt or the failure to give a necessary instruction, we apply the harmless beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Aledamat* (2019) 8 Cal.5th 1, 7–9 (*Aledamat*); *People v. Fraser* (2006) 138 Cal.App.4th 1430, 1456.) Under that standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, at p. 13.)

## 2. Instructions Related to Jury Evaluation of Omar's Credibility

Appellant contends the trial court gave two erroneous instructions that precluded jurors from properly assessing Omar's credibility. We consider each one separately.

25

### a. CALCRIM No. 315

First, appellant argues the court erred by instructing jurors under CALCRIM No. 315 (Eyewitness Identification) (CALCRIM 315) to consider Omar's confidence when assessing the reliability of his identification testimony. Describing the "overwhelming force" of social science research and decisions from several courts in other states that have found no correlation between confidence and accuracy, appellant contends the eyewitness certainty instruction was improper and violated due process.

Omar's testimony is described at length, *ante*. The trial court instructed the jury on evaluating the credibility of eyewitness identifications pursuant to CALCRIM 315. Among 15 considerations, the court instructed jurors that in evaluating [Omar's] identification testimony, jurors were to consider "[h]ow certain was the witness when he or she made an identification?"

In *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*), our Supreme Court held there was no error in the portion of the eyewitness identification instruction advising the jury it may consider an eyewitness's level of certainty. (*Id.* at pp. 461–463.) The court acknowledged the scientific studies that conclude "there is, at best, a weak correlation between witness certainty and accuracy" and that "some courts have disapproved instructing on the certainty factor in light of the scientific studies." (*Id.* at p. 462.) The court nevertheless declined to reexamine its previous holdings approving an instruction with the certainty factor, explaining there were a number of identifications in the case, both certain and uncertain, and it was not clear that courts in other states "would prohibit telling the jury it may consider this factor" as the defendant "would surely want the jury to consider how *uncertain* some of the identifications were." (*Ibid.*) The court also

determined the instructional claim was forfeited for lack of objection, and the inclusion of the certainty factor resulted in no harm to the defendant. (*Id.* at pp. 461–463.) In a concurring opinion, Justice Liu agreed the claim was forfeited and any error was harmless but urged the high court to reexamine the propriety of the instruction. (*Id.* at pp. 495, 498 (conc. opn. of Liu, J.).)

On May 17, 2021, after this case was fully briefed, the Supreme Court decided *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), in which it reexamined the eyewitness certainty instruction in CALCRIM 315 and considered whether it violated a defendant's due process. (*Id.* at pp. 646–647.) In *Lemcke*, the defendant was convicted of assault and robbery, and the prosecution's primary evidence at trial was the testimony of the victim who identified the defendant as her assailant. (*Id.* at p. 646.) The defendant argued that the court's CALCRIM 315 instruction, which told jurors to consider the witness's certainty when evaluating the identification evidence, violated his due process because research has shown that a witness's confidence in an identification is not a reliable indicator of accuracy. (*Ibid.*)

The Supreme Court rejected the defendant's due process argument " ' "in the context of the instructions as a whole and the trial record." ' " (*Lemcke, supra,* 11 Cal.5th. at pp. 657–661.) The court made clear that the challenged portion of CALCRIM 315 did not lower the prosecution's burden of proof, explaining, "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the

27

witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Id.* at p. 657.) In addition, the defendant was permitted to present expert testimony to combat any inference that certainty correlates with accuracy, and jurors received a separate instruction requiring they consider the expert opinion. (*Id.* at pp. 657–658.) Jurors were also instructed that the defendant was presumed innocent and the prosecution had the burden of proving all elements of the crime beyond a reasonable doubt. (*Id.* at p. 658.) The court also refuted the argument that the certainty instruction deprived the defendant of a meaningful opportunity to present a complete defense as to why the identification testimony was flawed. (*Id.* at pp. 658–660.) The defendant was allowed to put on a vigorous defense on the issue of identity. Again, the court cited the eyewitness identification expert whose testimony defense counsel emphasized at closing argument. (*Id.* at p. 660.) There was also sufficient opportunity to cross-examine the witness and the investigating officers regarding the identification. (*Ibid.*) In this context, listing witness certainty as one of 15 factors jurors should consider when evaluation an eyewitness's identification testimony did not amount to a due process violation. (*Id.* at p. 661.)

While affirming the defendant's convictions (*Lemcke, supra*, 11 Cal.5th at p. 670), the Supreme Court nevertheless acknowledged that CALCRIM 315 "has the potential to mislead jurors" given "the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' " (*Id.* at p. 665.) The court recognized "a risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy." (*Id.* at p. 669.) Given the complexities regarding how

jurors should be instructed on eyewitness testimony, the court referred the matter to the Judicial Council and the Council's Advisory Committee on Criminal Jury Instructions "to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Id.* at p. 647.) In addition, the court exercised its supervisory powers and directed "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Id.* at p. 669.)

As an initial matter, appellant forfeited his claim by not objecting to or requesting modification of CALCRIM 315 in the trial court. In *Sánchez*, the defendant similarly argued the trial court erred in instructing jurors with CALJIC 2.92 (the predecessor to CALCRIM 315) because there was a weak correlation between certainty and accuracy. (*Sánchez*, *supra*, 63 Cal.4th at p. 461.) The Attorney General argued the claim was forfeited because the defendant had not requested a modification in the trial court. The Supreme Court agreed and explained, "If defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so." (*Ibid*.) Here, there is no dispute that appellant did not object to CALCRIM 315, and there is no indication in the record he requested a modification of the instruction either. Since we are bound by the court's forfeiture holding in *Sánchez* (see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*)), we conclude appellant's challenge to CALCRIM 315 has also been forfeited.

Appellant argues that since the witness certainty instruction violated due process, reduced the state's burden of proof, and undercut his defense, the instructions affected his substantial rights and should be considered

under section 1259.[3]  Referencing *Lemcke*'s new directive to trial courts to omit the certainty instruction until revised, appellant asserts *Lemcke* should be applied to this case retroactively since it was not yet final on appeal.  He contends *Lemcke* requires reversal.

Even if we assume no forfeiture and apply the general rule of retroactivity, " ' "in the context of the instructions as a whole and the trial record" ' " (see *Lemcke, supra,* 11 Cal.5th at p. 661) we would not reach a different result.  Like the defendant in *Lemcke*—whose due process arguments were rejected and convictions affirmed notwithstanding the Supreme Court's new directive for trial courts to omit the certainty instruction—appellant has also failed to establish that including the certainty factor violated his due process rights under the circumstances presented.

Here, as in *Lemcke*, nothing in the CALCRIM 315 instruction jurors received operated to lower the prosecution's burden of proof or deprived appellant of his ability to present a meaningful defense.  The instruction was presented neutrally.  It did not equate certainty with accuracy.  Nor did it direct jurors to presume an identification is accurate if the eyewitness has expressed certainty.  Like the instruction in *Lemcke*, it simply listed the witness's certainty as one of 15 different factors to be considered when evaluate credibility of eyewitness testimony and left the jury to decide issues of credibility and what weight to be placed on that certainty in relation to the other factors.  Likewise, the court instructed with CALCRIM No. 220 (Reasonable Doubt) (CALCRIM 220), which told jurors that appellant "is

---

[3]     Section 1259 provides: "Upon an appeal taken by the defendant . . . [t]he appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."  (§ 1259.)

presumed innocent" which means the People had the burden of proving him "guilty beyond a reasonable doubt. [¶] . . . [¶] Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." The complete CALCRIM 315 instruction given jurors further underscored this burden, echoing that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime."

In addition, appellant was able to put on a vigorous defense on the issue of identity and was able to fully challenge Omar's identification testimony throughout the trial. During multiple, extensive cross-examinations, counsel questioned the reliability of the identification. He pressed Omar on why he did not identify anybody when testifying in the first trial if he had recognized them from the evening of the shooting. He interrogated Omar on the scope of his responses to the questions the officer posed to him in his initial police interview. Appellant also cross-examined the officer who initially questioned Omar and established that Omar had not told the officer anything about seeing a tattoo on one of the runners or any other distinguishing clothes besides his impression they were "cholo-type baggy." Omar's testimony from appellant's first trial was read into the record for jurors to hear for themselves how Omar testified. Thus, the jury heard Omar's statements in the first trial that he "couldn't see [the individuals running] very well because . . . [he] was just working on . . . what [he] was doing on [his] car and [he] just saw them go by. [He] didn't really pay close attention." In closing arguments, defense counsel emphasized all the inconsistencies in Omar's trial testimony compared to early statements he made, including the fact that in the first trial Omar never identified a tattoo

31

on either of the runners he saw. The jurors were able to consider all of this when weighing Omar's identification testimony and the rest of the evidence.

There also is also no indication in the record that appellant sought to introduce a defense expert on eyewitness testimony but was denied the opportunity to do so.

Appellant argues that the circumstances here differ from *Lemcke*, focusing on the fact that his trial did not include testimony from an expert who informed jurors that eyewitness testimony did not correlate to accuracy. He contends, "A fair reading of *Lemcke* shows that the expert testimony was central to the Supreme Court's analysis," and cites the three portions of the Court's analysis referring to the expert testimony. He adds, "[I]n contrast to *Lemcke*, the trial here featured no evidence at all to dispel the long-held and patently incorrect notion that an eyewitness' confidence in [his] or her identification is linked to the accuracy of that identification."

Appellant is correct that the expert testimony factored into *Lemcke*'s due process analysis, but we disagree that it was dispositive to the analysis or necessary for due process. The Supreme Court repeatedly advised in *Lemcke* that the due process analysis must occur " ' "in the context of the instructions as a whole and the trial record." ' " (*Lemcke*, *supra*, 11 Cal.5th at pp. 647, 655, 658, 661.) The expert testimony was one of several factors that could be considered along with the other jury instructions, the ability to cross-examine the witness and investigating officers, and arguments by counsel. Under the circumstances of this case—where the jury instructions reinforced the prosecution's burden of proof, appellant was able to vigorously cross-examine Omar and other witness, and trial counsel could argue all the faults he saw with the Omar's testimony to the jury—appellant has not

32

established that the court's decision to include the certainty factor in CALCRIM 315 violated his due process rights.

Since the certainty instruction did not render appellant's trial fundamentally unfair or amount to a due process violation, we see no grounds to reverse so that *Lemcke* can be retroactively applied. Moreover, because we conclude the court did not err in instructing the jury with CALCRIM 315, we do not reach the issue of prejudice.

### b. CALCRIM No. 337

The second instruction appellant claims prevented jurors from assessing Omar's credibility was CALCRIM No. 337 (Witness in Custody or Physically Restrained) (CALCRIM 337). In giving this instruction, he contends the court erred and violated his Fifth and Sixth Amendment rights by directing jurors "that they must ignore [Omar's] in-custody status when assessing his credibility." He argues the jury should not have been foreclosed from considering Omar's custody status, which was relevant to his credibility, and suggests Omar "was shading his testimony to favor the prosecution" in order to receive favorable treatment from the prosecution on a domestic violence charge he was facing.

At the time of his testimony, Omar appeared in a yellow jumpsuit and acknowledged that he was in custody on his own misdemeanor case. Outside the presence of the jury, the court granted the prosecution's request that Omar be granted immunity in order to compel his testimony, which meant his testimony could not be used against him in another criminal prosecution. After the grant of immunity, with all the jurors present, Omar explained that he had been in custody for approximately 10 months due to domestic violence charges. The court instructed jurors pursuant to CALCRIM 337, as follows: "When [Omar] testified, he was in custody. The fact that a witness is in

custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions I have given you."

As an initial matter, appellant has forfeited this claim. Generally, the failure to object to an instruction in the trial court forfeits any claim of error. (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 (*Andersen*); *People v. Valdez* (2004) 32 Cal.4th 73, 113 (*Valdez*) [defendant's failure to either object to proposed instruction or request additional language be given forfeits claim on appeal].) There is no dispute that appellant's trial counsel made no objection to this instruction, nor have we found any request for modification in the record.

Even if we assume no forfeiture, appellant's challenge fails. The instruction directed jurors that a witness's custodial status "does not *by itself* make a witness more or less believable." (CALCRIM No. 337, italics added.) In other words, the instruction merely said that Omar's custody status alone did not make him less credible and added that the jury's credibility determination should be made in accordance with other instructions. The instruction did not foreclose jurors from considering Omar's custody status or the circumstances of his detainment in assessing his credibility. Moreover, jurors were instructed with CALCRIM No. 226 (Witnesses), which included the direction that "[i]n evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," including "Was the witness's testimony influenced by a factor such as bias or prejudice?" and "What was the witness's attitude about the case or about testifying?" Accordingly, the jury was free to assess Omar's credibility in light of his custodial status.

Appellant also cites *People v. Cox* (1991) 53 Cal.3d 618 (*Cox*) and *People v. Rodriguez* (1986) 42 Cal.3d 730 (*Rodriguez*) to argue that his custodial

status was relevant to his credibility. *Cox* states, "Only when a witness has been granted immunity from prosecution or otherwise received favorable treatment in return for testifying should the jury consider any incentive in assessing his or her credibility." (*Cox, supra*, at p. 668, fn. 14.) *Rodriguez* makes the same point. (*Rodriguez, supra*, at p. 751.) The point is unremarkable. As noted, CALCRIM 337 did not foreclose jurors from considering Omar's custodial status or the circumstances of his incarceration in assessing his credibility.

Because we conclude the court did not err in instructing the jury with CALCRIM 337, we do not reach the issue of prejudice.

### 2. CALCRIM No. 359

Appellant argues the trial court erred when it instructed the jurors pursuant to CALCRIM No. 359 (Corpus Delecti: Independent Evidence of a Charged Crime) (CALCRIM 359) that they could find the identity of the person who committed the crime and the degree of the crime from appellant's statements alone. He says his statements alone were not enough to prove identity or degree of the crime, so "[b]y instructing jurors they could find the identity of the person who committed the crime and the degree of the crime from defendant's statements alone, the trial court undercut the state's burden of proving both identity and degree beyond a reasonable doubt."

As discussed above, when appellant and Maravilla were moved from the police station to jail in the wired transport van, they both made multiple statements about their individual interviews with police and events around their arrests which were recorded. In addition, according to the officer who interviewed appellant's mother, appellant told her that he was leaving the apartment shortly before the shooting and that he would return but never did.

The court instructed jurors with CALCRIM 359, as follows:  "The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence shows that the charged crime or a lesser included offense was committed.  [¶] . . . [¶]  This requirement of other evidence does not apply to proving the identity of the person who committed the crime and the degree of the crime.  If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it and the degree of the crime may be provided by the defendant's statements alone.  [¶]  You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

The instruction expresses the corpus delecti rule.  (*People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.)  Under this rule, every conviction "must prove the corpus delecti, or the body of the crime itself-i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause."  (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168 (*Alvarez*).  The prosecution cannot satisfy this burden by relying exclusively upon the extrajudicial statements, confessions, or admissions of the defendant, and the jury must be so instructed.  (*Id.* at pp. 1165, 1169.)  "Th[e] rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened."  (*Alvarez, supra*, 27 Cal.4th 1161, 1169.)

Appellant has forfeited this claim, as well.  (*Andersen, supra*, 26 Cal.App.4th at p. 1249; *Valdez, supra*, 32 Cal.4th at p. 113.)  There is no dispute that appellant's trial counsel made no objection to this instruction, nor have we found any request for modification in the record.  Even if there were no forfeiture and the court's CALCRIM 359 instruction were somehow

36

erroneous, we would not reach a different result because any such error would have been harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Anderson* (2007) 152 Cal.App.4th 919, 927 [in determining whether instructional error affected defendant's "substantial rights" under § 1259, "[t]he question is whether the error resulted in a miscarriage of justice under [*Watson*]"].)

In "consider[ing] the jury charge as a whole" (*Campos, supra*, 156 Cal.App.4th at p. 1237), there is no reasonable probability that the jury would have believed it could convict appellant under a reduced standard of proof, or that the outcome would have been more favorable to appellant absent the error. The jury was told multiple times that it could find appellant guilty of the charged crimes only if convinced beyond a reasonable doubt he committed them. The last paragraph of CALCRIM 359 expressly cautioned the jury that it could convict unless the prosecution proved the defendant's guilt beyond a reasonable doubt. The court also instructed jurors with CALCRIM 220, which defines reasonable doubt, stresses that proof beyond a reasonable doubt is required for everything the People must prove, and states that in deciding whether the People have proven their case beyond a reasonable doubt the jury "must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to acquittal and you must find him not guilty." Accordingly, we reject appellant's assertion that CALCRIM 359 undercut the state's burden of proof and permitted the jury to convict him on evidence amounting to less than proof beyond a reasonable doubt.

3.      **CALCRIM No. 372**

Appellant argues the trial court failed to give balanced instructions to the jurors on flight. Specifically, he contends the court erred by instructing jurors pursuant to CALCRIM No. 372 (Defendant's Flight) (CALCRIM 372) that they could rely on evidence of his alleged flight to convict him but not instructing jurors that they could rely on the absence of flight to acquit him.

As discussed, the prosecution presented evidence that appellant lived with his mother in the apartment around the block from the crime scene. One of the investigating officers testified that minutes before the shooting, appellant had told his mother he would be right back, but he left and never returned. Appellant's mother testified that in the 18 days following Adrian's murder, appellant did not return home and that he had never been gone for such a long period.

Appellant disputed the notion that he fled. The investigating officer had also told been that appellant usually stayed with his mother throughout the week but would spend the weekend with his girlfriend in Concord. Appellant's girlfriend's sister confirmed that he sometimes stayed overnight at her sister's place and would go directly to work from there. In addition, his former employer confirmed that appellant continued working full-time through September 25th.

The trial court instructed jurors with CALCRIM 372, as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Section 1127c requires the court to instruct the jury "where evidence of flight of a defendant is relied upon as tending to show guilt" as follows: "The flight of a person immediately after the commission of a crime, or after he is

38

accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. No further instruction on the subject of flight need be given." (§ 1127c.)

Appellant has forfeited this claim, too. (See *Andersen*, *supra*, 26 Cal.App.4th at p. 1249; *Valdez*, *supra*, 32 Cal.4th at p. 113.) There is no dispute that appellant's trial counsel made no objection to this instruction, nor have we found any request for modification in the record. Even assuming no forfeiture, the claim fails because he had no right to an absence of flight instruction. There is no requirement similar to section 1127c—which expressly states that "[n]o further instruction" on flight is necessary—that obligates a court to instruct on the absence of flight. Most critically, the Supreme Court has rejected arguments calling for an absence of flight instruction.

In *People v. Green* (1980) 27 Cal.3d 1 (*Green*), overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 235, the defendant argued on appeal that the "trial court erred in refusing to give his proffered instruction that the *absence* of flight by a suspect may be considered by the jury as circumstantial evidence that he had an innocent frame of mind." (*Green*, *supra*, at p. 36.) According to the Court, "the absence of flight is so ambiguous, so laden with conflicting interpretations, that its probative value on the issue of innocence is slight." (*Id.* at p. 39.) The Supreme Court concluded the trial court did not err in refusing to give the proffered instruction. (*Ibid.*)

In *People v. Williams* (1997) 55 Cal.App.4th 648 (*Williams*), the court noted that "*Green* did not address the constitutional claim now raised which

39

focuses on the lack of parity with the requirement of a flight instruction when supported by the evidence." (*Id*. at p. 652.) Addressing the argument, the court explained that "the inference of consciousness of guilt from flight is one of the simplest, most compelling and universal in human experience. [Citation.] The absence of flight, on the other hand, is far less relevant, more inherently ambiguous and 'often feigned and artificial.'" (*Ibid*.) The court rejected the argument that due process required an instruction on the absence of flight. (*Ibid*. ["[W]e decline the invitation to hold as a matter of law that due process . . . requires such an instruction . . ."].)

In *People v. Staten* (2000) 24 Cal.4th 434 (*Staten*), the Supreme Court again rejected the argument that the trial court erred in failing to instruct that a jury might consider the absence of flight as a factor tending to show innocence. (*Id*. at p. 459.) It expressly held that the lack of parity in the flight instruction did not violate due process. (*Ibid*.) The court made clear that its conclusion in *Green* "also forecloses any federal or state constitutional challenge based on due process." (*Ibid*.)

We are bound by our Supreme Court's holdings in *Green* and *Staten* that refusal to give an absence of flight instruction is proper and not unfair. (See *Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455.)

Without addressing *Green*, *Williams*, or *Staten*, appellant contends that this matter is controlled by *Cool v. United States* (1972) 409 U.S. 100 (*Cool*). There, the defendant was charged with possessing counterfeit bills. (*Id* at p. 100.) At trial, the defendant relied on accomplice testimony that was "completely exculpatory." (*Id*. at p. 101.) On the accomplice testimony, the trial court instructed the jury that as a predicate to consider the evidence, the jury must find it "true beyond a reasonable doubt." (*Id*. at p. 102, italics omitted.) The "clear implication" of the instruction was that jurors should

disregard the accomplice testimony unless they found it true beyond a reasonable doubt.  (*Ibid.*)  The Supreme Court concluded the instruction infringed on the defendant's Sixth Amendment right to present a defense and effectively reversed the burden of proof to require the defendant to establish her innocence beyond a reasonable doubt.  (*Id.* at 104.)

*Cool* has nothing to do with the CALCRIM 372 flight instruction and does not control here.  Also, the flight instruction here, which merely informed jurors that flight may show consciousness of guilt but cannot by itself prove guilt, does not suffer from the same flaw as the accomplice instruction in *Cool*, which interfered with the defendant's right to defend with evidence that merely raised a reasonable doubt and lowered the prosecution's burden of proof.

Because we conclude the court did not err in instructing the jury with CALCRIM 372 without including an absence of flight instruction, we do not reach the issue of prejudice.

## C.    Attempted Murder Convictions

As discussed, appellant was charged with the attempted willful, deliberate, and premeditated murders (§§ 664/187(a)) of the four friends with Adrian at the barbecue the evening Adrian was killed:  Oscar (count 2), Rohan (count 3), Edwin (count 4), and Jose (count 5).  The jury convicted appellant on all four charges.  The convictions required "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*).)  Appellant asserts two grounds for reversing these convictions.  We consider each argument separately.

### 1.    Kill Zone Instruction

Appellant first argues his attempted murder convictions must be reversed because the trial court improperly instructed the jurors they could rely on a kill zone theory to convict him.

The jury was instructed on attempted murder pursuant to CALCRIM No. 600 (Attempted Murder) (CALCRIM 600), which stated that it was the People's burden to prove that "1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill a person." In addition, the court provided this "kill zone" instruction: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' In order to convict the defendant of the attempted murder[s] of [Oscar, Rohan, Edwin, or Jose], the People must prove that the defendant not only intended to kill [Adrian], but also either intended to kill each charged victim named in the respective counts, or intended to kill everyone within the kill zone." The court further instructed the jurors that if they had reasonable doubt that defendant intended to kill any of these men, or intended to kill Adrian by killing everyone in the kill zone, they must find the defendant not guilty of the attempted murder charges.

The kill zone theory, first expressly embraced by our Supreme Court in *People v. Bland* (2002) 28 Cal.4th 313, 329–330 (*Bland*), provides a defendant can be found guilty of the attempted murder of victims who were not the defendant's "primary target." "[A]lthough the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone' " for attempted murder. (*Id*. at p. 329.) "[C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the

42

group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death." (*Id.* at p. 330.)

After appellant's conviction, the California Supreme Court decided *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), in which it re-examined the kill zone theory with the goal of "more clearly defining" the theory. (*Id.* at p. 606.) In *Canizales*, the two defendants fired handguns at two rival gang members attending an outdoor block party. (*Id.* at p. 598.) The shots were fired from a distance of 100 to 160 feet on a wide city street with escape routes. (*Id.* at p. 600.) The primary targets fled down the street in the opposite direction after the first shot and were not hit by gunfire, but a bystander was struck and died. (*Ibid.*) The defendants were charged with the bystander's murder and the attempted murders of the two rival gang members. (*Ibid.*) For the attempted murder charges, the trial court instructed on a kill zone theory and the jury convicted. (*Id.* at p. 601.)

In its effort to clarify the kill zone theory, the Supreme Court held "that a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill

43

everyone present to ensure the primary target's death — around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at pp. 596–597, 607.) It further explained, "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Id.* at p. 607.)

The Court cautioned trial courts to "exercise caution when determining whether to permit the jury to rely upon the kill zone theory" and to "tread carefully when the prosecution proposes to rely on such a theory." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) The Court noted that "[t]rial courts should . . . provide an instruction to the jury only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm. The use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Ibid*.) Under this guidance, the Court anticipated "there will be relatively few cases in which the theory will be applicable and an instruction appropriate." (*Ibid*.)

On the facts of the case before it, the Court found the evidence insufficient to warrant the kill zone instruction as the circumstances of the attack were not sufficient to support a reasonable inference that the

defendant intended to create a zone of fatal harm around a primary target. (*Canizales*, *supra*, 7 Cal.5th at pp. 609–611.) "The evidence presented here showed that from a substantial distance [the defendant] shot five bullets in the direction of a target who immediately ran down a city street after the first shot was fired. This evidence was insufficient to support instruction on the kill zone theory." (*Id.* at p. 611.)

### a. Forfeiture

As a threshold matter, the People contend that appellant forfeited this claim by failing to object to the instruction.

While the discussion about jury instructions was not reported, the court invited the parties to state any objections for the record and both declined. Nonetheless, we conclude the issue is not forfeited because the asserted instructional error affects his substantial rights. (§ 1259; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) We therefore review appellant's claim on the merits.

### b. Intent to Kill

In the case before us there was insufficient evidence to support giving the CALCRIM 600 kill zone instruction as it is only appropriate where the defendant had a primary target, sought to annihilate everyone within the kill zone in order to ensure killing the primary target, and the attempted murder victims were inside the kill zone. (See *Canizales*, *supra*, 7 Cal.5th at pp. 597, 607.)

The parties do not dispute that there was substantial evidence from which the jury could infer that Adrian was the primary target. Both appellant and Maravilla were Sureños, and Adrian was at least perceived to be part of the rival Norteños based on his clothing. He wore red shoes and a red Washington Nationals baseball cap, items associated with Norteños. Of

the six spent bullets found, at least four of them were close to Adrian's location by the Camry. Hence, there was substantial evidence in the record from which the jury could infer Adrian was the primary target in the shooting.

The kill zone instruction, however, also required sufficient evidence "to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm" as a means of killing Adrian. (*Canizales*, *supra*, 7 Cal.5th at p. 608.) That is not the case here. Based on the scope and nature of the attack, the "only reasonable inference" is not that appellant and Maravilla intended to create a zone of fatal harm, or kill zone, around Adrian. Considering the circumstances of the offense *Canizales* instructs us to consider—the type of weapon used, the number of shots fired, the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target—other reasonable inferences can also be reached.

First, the weapon used to kill Adrian was a single nine-millimeter handgun based on the brass shell casings found in the street. While deadly, as in *Canizales*, the use of this kind of weapon generally does not evince an intent to kill everyone in a particular zone. (See *Canizales*, *supra,* 7 Cal.5th at pp. 611–612 [kill zone instruction not warranted where defendant used a 9mm handgun].) It stands in sharp contrast to the type of "high-powered wall-piercing" assault rifle that has factored into a defendant's intent to create a kill zone. (See *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [use of high-powered wall-piercing weapons in part created a reasonable inference that the defendants intended to kill every living being inside the residences at which they shot]; *People v. Cerda* (2020) 45 Cal.App.5th 1, 16–17 [use of

46

AK-47 assault rifle whose high caliber ammunition traveled four times the velocity of handgun ammunition and had the potential for penetrating substantial barriers favored kill zone instruction].)

With respect to the shots fired, nine brass casings were recovered on the north end of Powell, so at least that many shots were fired by the gunman. The People contend that 11 shots were fired based on counsel's count on Shotspotter. Whether 9 or 11, there were undoubtedly more shots fired than needed to kill one person. But as *Canizales* instructs, "the number of shots fired, although relevant to the inquiry, is not dispositive." (*Canizales*, *supra*, 7 Cal.5th at p. 610.)

Based on where the brass shell casings ejected and were found, Adrian was likely not shot from the close proximity generally associated with the intent to create a kill zone. In *Canizales*, the Supreme Court described multishot cases which supported the kill zone instruction where "defendants opened fire while in close proximity to . . . their intended target." (*Canizales*, *supra*, 7 Cal.5th at pp. 610–611.) The Supreme Court observed that in *Bland*, *supra*, 28 Cal.4th 313, the defendant approached the driver's side of the victim's car and started shooting, and in *State v. Wilson* (1988) 546 A.2d 1041, the defendant opened fire after engaging in a heated verbal argument and threatening to pistol whip the target. (*Ibid.*) By contrast, here, the closest brass casing was found 61 feet from where Adrian fell and the furthest casing was found approximately 132 feet away. This is similar to *Canizales* where five bullets shot from a distance of either 100 or 160 feet were insufficient to support the kill zone instruction. (*Id.* at p. 611; see also *People v. Cardenas* (2020) 53 Cal.App.5th 102, 110 [15 shots are filed from 40 feet away or closer not sufficient dispositive evidence for kill zone instruction].)

Rohan and Jose's proximity to Adrian clearly weighs against finding an intent to create a kill zone. Rohan testified that he was facing the apartment and was "[m]aybe 10 feet" away from Adrian, who was on his right, when he heard the shots. Jose also testified that he was facing the apartment with his back to the street and that he was 10 feet away from Adrian when the shooting occurred. (See *Cardenas*, *supra*, 53 Cal.App.5th at p. 115 [kill zone instruction not warranted where attempted murder victims appeared to be at least 5 five feet away from victim and seeking cover].) Oscar's stipulated statement stated only that the shooter "fired into the group standing near him" but did not otherwise detail where he was relative to Adrian. This evidence is not sufficient to merit the instruction. Edwin testified he was "[l]ike, about two inches away from [Adrian]. We were shoulder to shoulder, like, right next to each other." While such close proximity generally favors the instruction, we are not able to determine from the record whether Edwin stood between Adrian and the shooter, where killing him could have been a means of killing Adrian, or on Adrian's opposite side, where killing him would not have been necessary to kill Adrian.[4] For Edwin, this factor is

---

[4] Appellant acknowledges Edwin's testimony that he was shoulder-to-shoulder with Adrian but asserts that the prosecution introduced no testimony as to where Edwin stood in relation to the shooter. He argues that if Edwin had been closer to the apartment building, the shooter's view of him may have been obstructed by the garage of the neighbor's house immediately to the north. In response, the People contend only that appellant's argument "is based on speculation and farfetched scenarios that suggest that appellant would argue against the kill zone regardless of the evidence" but do not otherwise address appellant's argument. Absent more precise evidence on Edwin's location, it is reasonably possible to infer the shooter's view of Edwin could have been obstructed by the neighbor's protruding garage. On this record, we are not inclined to conclude that evidence sufficiently demonstrated that "the only reasonable inference" is that the shooter intended to kill Edwin in order to ensure Adrian's death.

inconclusive based on the record before us.  While we recognize that the sufficiency of the analysis "does not turn on the effectiveness or ineffectiveness of the defendant's chosen method of attack" (*Canizales*, *supra*, 7 Cal.5th at p. 611), our conclusion here is also informed by the fact that none of the attempted murder victims—including Edwin—were hit by any of the shots fired.

Finally, we factor into our analysis the location of the shooting.  (See *Canizales*, *supra*, 7 Cal.5th at p. 611 [no inference of intent to kill where attacked occurred at a block party on a wide city street, not in any alleyway, cul de sac, or some other area or structure from which victims would have limited means of escape].)  The attack against Adrian and his friends occurred during an outside barbecue on a long driveway where multiple cars were parked and which led out onto a public street.  At this location, one could drop to the ground, as Rohan and Jose did; run out into the street, as Omar did when he gave chase; or even take cover behind a parked car.

On this record, we cannot conclude the only reasonable inference arising from the scope and nature of the attack is that appellant and Maravilla intended to create a zone of fatal harm around Adrian and his friends.  While there is no doubt that the attack subjected everyone near Adrian to great risk, that is not enough to warrant the kill zone instruction. (*Canizales*, *supra*, 7 Cal.5th at p. 608 ["[M]erely *endanger*[ing] everyone in the area is insufficient to support a kill zone instruction."].)  In light of our conclusion, we do not consider whether the attempted murder victims were located within that zone of harm.

The People contend all the factors listed in *Canizales* supported the inference that appellant and Maravilla intended to kill everyone in the kill zone—the semiautomatic weapon, the 11 shots fired most of which occurred

49

after Adrian had been hit, the 60 feet between the shooter and Adrian, and the proximity of the attempted murder victims to Adrian. We are not persuaded and note that some of their assertions are not supported by the record. For instance, the People claim that because "the evidence suggested that [Adrian] was shot by the first or second bullet[] fired[,]" the shooter must have intended to kill the others because he continued to fire all eleven bullets he had. The People cite Rohan and Edwin's testimony to support these contentions, but their testimony said nothing about which bullet hit Adrian. Rohan stated that upon hearing shots, "[w]e all ducked down, tried to go for cover, and then that's when I saw Adrian was hit." Edwin said that he "couldn't really see anything" because of the darkness, and threw himself on the ground when somebody said gunshots. After the gunshots stopped, he tried to help Adrian up. Neither identified which bullet shot their friend.

For the reasons explained, we cannot conclude the only reasonable inference from the evidence in this case is that appellant or Maravilla specifically intended to kill everyone around Adrian as a means of killing Adrian.

### c. *People v. Mumin*

While this appeal was pending, the Fourth District Court of Appeal decided *People v. Mumin* (2021) 68 Cal.App.5th 36 (*Mumin*), which offered a different view of the direction in *Canizales* that a kill zone instruction should be given "only in those cases where the court concludes there is sufficient evidence to support a jury determination that the only reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Canizales*, *supra*, 68 Cal.App.5th at p. 608.)

50

The *Mumin* court agreed with the argument the People advanced in that case that *Canizales*'s articulation of the "only reasonable inference" standard did not mean the reviewing court must itself be convinced that the sole reasonable inference from the evidence is that the defendant had the requisite intent to kill. (*Mumin*, at p. 844.) *Mumin* concluded: "*Canizales* does not depart from, and instead reaffirms, established principles governing a trial court's decision to instruct on a theory of liability and an appellate court's review of such a decision. The trial court must determine whether the evidence would support a jury determination that the only reasonable inference was that the defendant held the requisite intent. If a trial court's decision to instruct is challenged on appeal, we must make the same determination on de novo review. But, in so doing, the issue is not whether we believe the only reasonable inference from the evidence is that the defendant had the requisite intent—just as, in other substantial evidence contexts, the issue is not whether we believe the defendant to be guilty beyond a reasonable doubt. The issue is whether the evidence would support such a determination by the jury. Under these circumstances, it is well established that the evidence supports a jury determination that an inference is the only reasonable inference if we conclude it is at least a reasonable inference." (*Mumin*, at p. 844 [disagreeing with *In re Rayford* (2020) 50 Cal.App.5th 754 to the extent it holds otherwise].)

Had the People advocated the analysis adopted in *Mumin*, we could have considered the propriety of a retrial on the kill zone theory of attempted murder for the count involving Edwin in light of the evidence of Edwin's close proximity to Adrian, the weapon used, the multiple spent bullets found in the area where Adrian was shot and killed, and other evidence.

For now, we submit it is unclear whether *Mumin* correctly applies *Canizales*'s "only reasonable inference" standard. On the one hand, *Mumin*'s analysis of the standard aligns with settled principles controlling appellate review of a trial court's decision to instruct on a theory of liability. It is easily applied and contemplates that the jury, not the appellate court, is the proper body for determining whether the only reasonable inference arising from the circumstances of an offense is that the defendant intended to kill everyone in the zone of fatal harm. On the other hand, if, as *Mumin* suggests, a reviewing court must construe the facts in the light most favorable to the judgment when determining whether the "only reasonable inference" standard is met, then application of the kill zone theory appears significantly broadened in contravention of the Supreme Court's explicit efforts in *Canizales* to limit the theory's application.

A petition for review is pending in *Mumin*. It would be helpful if the Supreme Court were to provide additional guidance regarding the application of the *Canizales* standard.

### d. Prejudice

We next consider whether the erroneous kill zone instruction was prejudicial based upon whether the error was harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. at 24. (*Canizales*, *supra*, 7 Cal.5th at p. 615; *Aledamat*, *supra*, 8 Cal.5th at p. 13.) Under that test, we ask " 'whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.' " (*Canizales*, at p. 615.) Here, reversal is required as there is a reasonable possibility that the error may have contributed to the verdict. (*Cardenas*, *supra*, 53 Cal.App.5th at p. 102.)

The trial court instructed the jury with two theories of liability for the attempted murder charges. It instructed with the traditional theory of

attempted murder that required jurors to find that appellant took at least one direct but ineffective step toward killing another person and that appellant intended to kill that person. As discussed extensively, *ante*, it also instructed jurors with the kill zone theory.

As explained *ante*, the kill zone instruction given to jurors was factually inadequate because it described a theory of liability that could not be supported by the evidence. Further, the instruction jurors received was the same kill zone instruction which *Canizales* found legally inadequate. (See *Canizales*, *supra*, 7 Cal.5th. at pp. 613–614.) As *Canizales* explained, "Beyond its reference to a 'particular zone of harm,' the instruction provided no further definition of the term 'kill zone.' Nor did the instruction direct the jury to consider evidence regarding the circumstances of [appellant's] attack when determining whether [he] 'intended to kill [Adrian] by killing everyone in the kill zone.'" (*Canizales*, at p. 613.) The instruction therefore created the potential for confusion by allowing the jury to apply the kill zone theory without consideration of the particular circumstances of the attack. (See also *In re Rayford* (2020) 50 Cal.App.5th 754, 782 (*Rayford*) ["By defining the kill zone as a 'zone of risk,' the instruction erroneously allowed the jury to convict [the defendants] if the evidence showed they intended to subject individuals in the 'zone of risk' to a risk of harm, regardless of whether they intended to kill the individuals in order to kill the primary target."].)

In determining prejudice under these circumstances, *People v. Thompkins* (2020) 50 Cal.App.5th 365, is instructive. There, the jury had been instructed with both the traditional theory of attempted murder and the kill zone theory. (*Id.* at p. 397.) The court also dealt with a legally and factually inadequate kill zone instruction. (*Id.* at p. 399.) The Attorney General argued that since there was sufficient evidence to support the

attempted murder convictions under the traditional theory of attempted murder without the kill zone instruction, the kill zone instruction was harmless. (*Id.* at p. 397.) In assessing prejudice from such an error, *Thompkins* explained, "[T]he question is not whether we think it clear beyond a reasonable doubt that the defendants were actually guilty of . . . attempted murders based on the valid theory." (*Id.* at p. 399.) Instead, the reviewing court must determine "whether we can say, beyond a reasonable doubt, the jury's actual verdicts were not tainted by the inaccurate jury instruction. We focus on the likelihood that the jury relied on the kill zone instruction in reaching its verdicts, not simply the likelihood of defendants' guilt under a legally correct theory." (*Ibid.*)

Under this standard, we cannot conclude beyond a reasonable doubt that the jury's actual verdicts were not tainted by the inaccurate jury instructions. Of significance, the prosecutor relied almost exclusively on the kill zone theory in urging jurors to convict on the attempted murder charges. When first addressing the attempted murder charges, he set forth the elements of the traditional theory but did not discuss those any further. Instead, he directed the jurors' attention to the kill zone theory, stating, "I'm going to talk about this kill zone theory when it comes to the attempted murder victims." He then discussed the details of the attack and the location of the victims. Afterwards, he stated, "During my closing, that's all I'm going to say about the attempted murders and the kill zone." He did not return to discuss the attempted murder charges again. Clearly, the prosecution emphasized the kill zone in arguing to the jury that appellant was guilty of attempted murder and, in doing so, he invited the jury to use a legally erroneous instruction. Accordingly, we must reverse the attempted murder convictions as we cannot determine beyond a reasonable doubt that at least

one juror did not convict appellant under a kill zone theory. (See *Thompkins*, *supra*, 50 Cal.App.5th at pp. 400–401; *Rayford*, *supra*, 50 Cal.App.5th at pp. 781–784.)

### 2. Sufficiency of the Evidence

Appellant next argues his attempted murder convictions require reversal because there was insufficient evidence he intended to kill the alleged attempted murder victims. Even though we have reversed the attempted murder convictions based on instructional error, we must decide this issue because the People are permitted to retry appellant for the attempted murder charges only if sufficient evidence was presented in the trial court to support them.

To prove the crime of attempted murder, the prosecution must establish "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*Lee*, *supra*, 31 Cal.4th at p. 623.) Direct evidence of intent to kill is rarely available, but intent to kill may be inferred from the circumstances of the crime and a defendant's actions. (*Sánchez*, *supra*, 63 Cal.4th at p. 457.) " 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." ' [Citations.] 'Even if the "shooter merely perceive[es] the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of an intent to kill." ' " (*Cardenas*, *supra*, 53 Cal.App.5th at p. 119.)

"An attempted murder is premeditated and deliberate if it occurs ' " 'as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " ' [Citations.] ' "In this context, 'premeditated' means

'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citations.] 'The process of premeditation and deliberation does not require any extended period of time.' " (*Cardenas, supra*, 53 Cal.App.5th at p. 121.)

" '[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' " (*People v. Pettie* (2017) 16 Cal.App.5th 23, 52.)

"In reviewing a sufficiency of the evidence claim, our role is limited. We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt. [Citations.] We draw all reasonable inferences in favor of the judgment." (*Cardenas, supra*, 53 Cal.App.5th at p. 119, fn. 11.)

Here, even if we assume Maravilla was the shooter and appellant was his aider and abettor, we conclude there was sufficient evidence from which jurors could reasonably infer appellant had the specific intent to kill Oscar, Rohan, Edwin and Jose with premeditation and deliberation. Maravilla's act of shooting in the direction of Adrian's friends in the driveway readily supports an inference of an intent to kill. (*See Cardenas, supra*, 53 Cal.App.5th at p. 120; *People v. Lashley* (1991) 1 Cal.App.4th 938, 944–945 [concluding there was sufficient evidence of intent to kill to support attempted murder conviction where defendant shot at a group of people on the bank of a creek from the second story of an adjacent apartment building]; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1149 [concluding that

56

conviction for attempted murder was supported by sufficient evidence where defendant intentionally shot at victim's chest was sufficient to permit the jury to conclude he had the requisite intent].)

Appellant's actions also support an inference that he, too, shared this intent and did so with premeditation and deliberation.  Appellant was with Maravilla in the hours leading up to the shooting, as the two spent most of the day together in an apartment located across the street from Edwin's driveway where the barbecue was held.  From appellant's apartment, they could see the activity at the barbecue and the men there.  Based on the surveillance video, jurors could have reasonably inferred that appellant and Maravilla left the apartment together with a firearm and proceeded to the barbecue in a roundabout manner so that the shooter could approach discretely or unseen.  While there is no indication that they both proceeded down Powell to fire shots at the barbecue, jurors could reasonably infer that appellant was nearby when the shooting occurred and that moments after the shooting, he reunited with Maravilla to flee the scene together.  After their arrests, appellant made statements in the wired van from which a juror could also infer appellant knew of Maravilla's plan and assisted him to accomplish it.  In the van, appellant said, "Yeah I heard the (unintelligible) I heard the gunshots," from which a juror could infer he was at the shooting, notwithstanding his efforts to walk back the statement immediately after saying it.  In addition, after Maravilla commented that it had been "damn near a whole month since it happened," appellant responded, "Hell yeah.  We found them."  In light of the circumstances, jurors could have reasonably understood Maravilla to be discussing the shooting and appellant's comments to be an acknowledgement of his involvement in seeking out the victims.

57

Based on this evidence, jurors could reasonably infer appellant and Maravilla planned, committed, and fled from the crime together. This was sufficient evidence to support an inference that appellant shared the intent to kill necessary for attempted murder and a finding that he did so with premeditation and deliberation. Accordingly, on remand, the People may retry counts 2 through 5 on a non-kill zone theory if they so elect.

### D. Gang Special Circumstance

#### 1. Section 190.22

Appellant argues the trial court incorrectly instructed jurors they could find the gang special circumstance under section 190.2, subdivision (a)(22) (section 190.2(a)(22)) true even if he was not the one who actually killed Adrian. In appellant's view, the special circumstance was restricted to Adrian's actual killer and everyone agreed appellant was not the one who actually shot him.

As discussed, the prosecution charged appellant with the special circumstance of committing murder while a participant in a criminal street gang in violation of section 190.2(a)(22). That section provides: "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if . . . [t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).)

The trial court instructed the jurors with CALCRIM No. 736, which set forth the requirements of the gang special circumstance. The instruction stated, in part, that to prove the special circumstance true, the People must prove: "1. The defendant intentionally killed [Adrian]; [¶] 2. At the time of

the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; [¶] AND [¶] 4. The murder was carried out to further the activities of the criminal street gang." The jury found the special circumstance true.

Appellant has also forfeited this claim. Generally, the failure to object to an instruction in the trial court forfeits any claim of error. (*Andersen, supra*, 26 Cal.App.4th at p. 1249; *Valdez, supra*, 32 Cal.4th at p. 113.) Appellant did not object to this instruction, so this challenge too has been forfeited.

Even if we assume no forfeiture, there was no error in the court's gang special circumstance instructions as it would apply to appellant as either a shooter or as an aider and abettor. Appellant relies on the language "intentionally killed the victim" in section 190.2(a)(22) for his argument that the special circumstance is restricted to the actual killer. We disagree. Section 190.2, subdivision (c) (section 190.2(c)), makes clear the gang special circumstance is not restricted to direct perpetrators. That section states: "*Every person, not the actual killer, who, with the intent to kill, aids, abets,* counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (c), emphasis added.) Under the statute's plain language, the gang special circumstance is not limited to the "actual killer" but includes one who "aids" and "abets." (*Ibid.*)

59

In *People v. Ybarra* (2008) 166 Cal.App.4th 1069 (*Ybarra*), disapproved on another ground in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1387, the court rejected an argument similar to the one made by appellant. There, the jury found the defendant and his co-defendant guilty of first-degree murder and the gang special circumstance true as to both. (*Ybarra, supra*, at p. 1085.) However, the jury made dissimilar findings on the allegation that they had personally and intentionally discharged the firearm, finding it not true as to the defendant but true as to his co-defendant. (*Id.* at p. 1086.) On this basis, the defendant inferred that he was not considered the actual killer and argued that the court's instruction which allowed the jury to find the special circumstance true as to him was erroneous since he was not the one who actually killed the victim. (*Id.* at pp. 1085–1086.) Relying on section 190.2, subdivision (c), discussed *supra*, the court rejected the argument and explained, "[T]he authorizing statute authorizes [the gang special circumstance] allegation even if the defendant is 'not the actual killer.'" (*Id.* at p. 1086.) We agree with *Ybarra* and likewise conclude there was nothing erroneous about the court's instruction that jurors could find the special circumstance true as to appellant, even if they found he was not the actual killer.

Appellant argues, "By its own terms, [section 190.2(c)] cannot apply to subdivision (a)(22). Importantly, subdivision (c) has a condition precedent. It only applies to aiders and abettors '*if one or more of the special circumstances enumerated in subdivision (a) has been found to be true . . .*'" Appellant asserts that the condition precedent cannot be met "because the plain language of [section 190.2(a)(22)] shows that it only applies to actual killers." This is a strained, circular reading of the statute. "[I]n reviewing the text of a statute, we must follow the fundamental rule of statutory construction that

requires every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary." (*People v. Arias* (2008) 45 Cal.4th 169, 180.) Appellant's condition precedent reading of section 190.2(c) would render the statute meaningless because an aider and abettor could never be subject to the gang special circumstance, contrary to the statute's plain language establishing that the special circumstances listed in section 190.2(a) apply to "every person" who acts with the intent to kill.

### 2. Insufficient Evidence

In an ancillary argument, appellant contends the gang special circumstance must be stricken since there was insufficient evidence to show he was the one who actual killed Adrian. Since appellant did not need to be the actual shooter to sustain this special circumstance, we reject this argument. Again, the special circumstance applied to him as an aider and abettor who acted with the intent to kill. (See *Ybarra*, *supra*, 166 Cal.App.4th at p. 1086.)

### E. Imposition of Restitution and Assessments

Appellant contends the restitution and assessments imposed on him must be stricken or at least stayed because the trial court disregarded evidence of his inability to pay.

Adrian's family received $7,500 from the Victim Compensation Board for his funeral and burial expenses. The prosecutor requested that $7,500 in restitution be awarded to the Victim Compensation Board. Appellant's sentencing brief noted that appellant was "indigent and will be facing many, many years in prison" and asked the court to "minimize any statutory fines- and not impose any fines that the law does not require." At the sentencing hearing, appellant objected to the $7,500 restitution request based on his inability to pay. The trial court ordered appellant to pay $7,500 in victim

restitution pursuant to section 1202.4, subdivision (f).[5]  In addition, the court ordered appellant to pay a restitution fine of $1,500 pursuant to section 1202.4, subdivision (b)[6]; a court operations assessment of $200 pursuant to section 1465.8[7]; and a conviction assessment of $150 pursuant to Government Code section 70373.[8]

Appellant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) for his argument that these restitution payments and assessments should be stricken or stayed.  In *Dueñas*, the defendant—an indigent and homeless mother of young children who suffered from cerebral palsy, dropped out of high school due to her illness, was not working, received public assistance, and had been unable to pay prior citations and fees—was convicted of driving with a suspended license.  (*Id.* at pp. 1160–1163.)  At sentencing, she argued she did not have the ability to pay fees and fines, produced evidence of her inability to pay, and requested a hearing on the issue.  (*Id.* at pp. 1162–1163.)  The appellate court concluded "due process of

[5]     Section 1202.4, subdivision (f) states in part that subject to certain exceptions, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court."  (§ 1202.4, subd. (f).)

[6]     Section 1202.4, subdivision (b) states in part that "[i]n every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record."  (§ 1202.4, subd. (b).)

[7]     Section 1465.8 states in part:  "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense."  (§ 1465.8, subd. (a)(1).)

[8]     Government Code section 70373 states in part:  "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense."  (Gov. Code, § 70373, subd. (a)(1).)

law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373" and that while "Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Id.* at p. 1164.) The trial court struck the court operations assessment under section 1465.8 and Government Code section 70373 and stayed the section 1202.4 restitution fine until the defendant's ability to pay was proven. (*Id.* at pp. 1172–1173.)

*Dueñas* does not compel us to strike or stay the restitution or assessments ordered by the court. The $7,500 in victim restitution ordered under section 1202.4, subdivision (f) is not subject to the due process concerns addressed in *Dueñas*. *Dueñas* explained, "California law provides for two types of restitution: direct restitution to the victim (§ 1202.4, subd. (f)), which is based on a direct victim's loss, and a restitution fine (§ 1202.4, subd. (b)), which is not. Payment of direct victim restitution goes directly to victims and compensates them for economic losses they have suffered because of the defendant's crime." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.)

Appellant acknowledges that direct victim restitution was not ordered or at issue in *Dueñas*, and he cites no case that extends *Dueñas* to victim restitution funds under section 1202.4, subdivision (f).

In *People v. Evans* (2019) 39 Cal.App.5th 771 (*Evans*), the court declined to extend *Dueñas* to victim restitution and concluded that a

63

defendant's ability to pay victim restitution is not a proper factor in setting a restitution award under section 1202.4, subdivision (f). (*Id.* at p. 777.) *Evans* observed that assessments for court facilities and operations and a restitution fine paid into a statewide victim compensation fund are quite different than actual restitution to the victim based on the economic losses suffered as a result of defendant's conduct. (*Ibid.*) The court noted, "In a civil action for compensatory damages, a defendant's wealth is irrelevant to liability" and "conclude[d] similarly that a defendant's ability to pay victim restitution is not a proper factor to consider in setting a restitution award." (*Ibid.*) Several courts have adopted the reasoning of *Evans* and its conclusion that *Dueñas* does not extend to section 1202.4, subdivision (f) victim restitution. (See *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 859; *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; *People v. Allen* (2019) 41 Cal.App.5th 312, 326.) We likewise conclude that *Dueñas* does not extend to victim restitution under section 1202.4, subdivision (f).

Appellant contends the "constitutional concerns discussed in *Dueñas* regarding ability to pay are directly relevant to victim restitution." He further states that *Evans* "did not directly grapple with constitutional due process, equal protection, or excessive fine concerns raised in *Dueñas*." We disagree. *Evans* explained the same constitutional concerns raised in *Dueñas* regarding a defendant's ability to pay are inapplicable when it comes to reimbursing his or her victim for economic losses caused by criminal conduct. (*Evans, supra*, 39 Cal.App.4th at p. 771.) Indeed, our state Constitution provides that crime victims "shall be entitled . . . [t]o restitution" and that "all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).)

64

As to the $1,500 restitution fine ordered pursuant to section 1202.4, subdivision (b), the $200 court operations assessment pursuant to section 1465.8, and the $150 conviction assessment pursuant to Government Code section 70303, we will not disturb them either. Even assuming error under *Dueñas*, we would nonetheless conclude such error was harmless beyond a reasonable doubt. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140.) Nothing in the record indicates that appellant, like the defendant in *Dueñas*, has a history of being unable to pay court assessments, has limited assets or income that he needs to devote to vital child-care needs, or has a disability that casts doubt on his ability to obtain the funds for payment in the future. In fact, the record indicates that prior to his arrest, appellant had worked full-time for two years at two university eateries providing "all-around help"—bussing, dishwashing, and stocking.

Moreover, a defendant's ability to pay is not limited to his or her present financial situation but can also be based on his or her future ability to earn prison wages. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Staley* (1992) 10 Cal.App.4th 782, 785.) At the time of sentencing, appellant was 26 years old, and he will be serving a life term in prison. Nothing in the record indicates that he will be unable to work or ineligible for work assignments in prison. He will have the capacity to earn during this time.

## F.     Section 3051

Finally, appellant raises a constitutional challenge to section 3051, which allows LWOP offenders who committed their crimes as juveniles to be considered for youth offender parole hearings but not LWOP offenders who committed their crimes when they were between 18 to 25 year old (referred to as young-adult offenders or young-adult LWOP offenders). Appellant was 24

65

years old when Adrian was shot and killed. Following his convictions, the trial court sentenced him to LWOP. He contends section 3051's exclusion of young-adult offenders like him from such hearings violates the equal protection clause of the Fourteenth Amendment to the U.S. Constitution.

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195 (*Edwards*).) "The right to equal protection of the law is violated when 'the government ... treat[s] a [similarly situated] group of people unequally without some justification.' " (*People v. Love* (2020) 55 Cal.App.5th 273, 287.)

"To succeed on an equal protection claim, [petitioner] must first show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*Edwards, supra,* 34 Cal.App.5th at p. 195.) "[E]qual protection analysis does not require that two groups of defendants be the same, or even that they be ' " 'similarly situated for all purposes.' " ' [Citation.] It is enough that ' " ' "they are similarly situated for purposes of the law challenged." ' " ' " (*Id.* at p. 198.)

If a class of criminal defendants is similarly situated for purposes of the law challenged to another class of defendants who are treated differently, "courts look to determine whether there is a rational basis for the difference." (*Edwards, supra,* 34 Cal.App.5th at p. 195.) "[E]qual protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) "This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely

66

ignored [citation], a court may engage in ' "rational speculation" ' as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.' " (*Id.* at pp. 74–75.)

To successfully challenge a law on equal protection grounds, the defendant must negate " ' "every conceivable basis" ' " on which "the disputed statutory disparity" might be supported. (*Edwards*, *supra*, 34 Cal.App.5th at p. 195.) "If a plausible basis exists for the disparity, '[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law.' " (*Id.* at pp. 195–196.) We independently review defendant's equal protection challenge to section 3051. (*People v. Jackson* (2021) 61 Cal.App.5th 189, 195 (*Jackson*).)

Section 3051 " 'establish[es] a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity.' " (*In re Trejo* (2017) 10 Cal.App.5th 972, 980 (*Trejo*); §§ 3051 et seq.) The statute was a response to decisions from the United States and California Supreme Courts concerning Eighth Amendment limitations on juvenile sentencing that rested on developments in science and social science showing fundamental differences between juvenile and adult minds and parts of the brain involved in behavior control. (*People v. Acosta* (2021) 60 Cal.App.5th 769, 775–776 (*Acosta*), rev. den. June 9, 2021, S267783.) The Legislature sought to address "lengthy life sentences did not adequately account for, first, the diminished culpability of youth, and second, youthful offenders' greater potential for rehabilitation and maturation." (*In re Williams* (2020) 57 Cal.App.5th 427, 434 (*Williams*).)

As originally enacted in 2013, section 3051 applied where the controlling offense[9] was committed before the offender was 18 years old (*Trejo*, *supra*, 10 Cal.App.5th at p. 981 & fn. 6.) but excluded juvenile LWOP offenders. (*Acosta*, *supra*, 60 Cal.App.5th at p. 776.) Additional amendments based on scientific evidence showing that areas of the brain that affect judgment and decision-making do not develop until early-to-mid 20s followed. (*People v. Morales* (2021) 67 Cal.App.5th 326, 346 (*Morales*).) In 2016, the Legislature amended the statute to extend the availability of youth offender parole hearings to offenders who were under 23 years old when they committed their controlling offenses. (Stats. 2015, ch. 471 (Sen. Bill No. 261), § 1, eff. Jan. 1, 2016; see *Trejo*, at p. 981 & fn. 6.) In 2018, the hearings were extended to offenders who were 25 years old or younger when they committed their controlling offenses. (Stats. 2017, ch. 684 (Sen. Bill No. 394), § 3051, eff. Jan. 1, 2018.) The Legislature also amended section 3051 to allow parole hearings for juveniles sentenced to LWOP. (Stats. 2017, ch. 684; *Morales*, *supra*, at p. 346.)

In the statute's current form, an offender who committed a controlling offense under the age of 25 is entitled to a youth offender parole hearing during his or her 15th year of incarceration if he or she received a determinate sentence; during his or her 20th year of incarceration if he or she received a life term of less than 25 years to life; and during his or her 25th year of incarceration if he or she received a term of 25 years to life. (§ 3051, subd. (b)(1)-(3).) An offender convicted of a controlling offense committed before the age of 18 for which he or she was sentenced to LWOP is entitled to a youth offender parole hearing during his or her 25th year of incarceration.

---

[9] " 'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

68

(§ 3051, subd. (b)(4).)  An offender convicted of a controlling offense committed *after* the age of 18 for which he or she was sentenced to LWOP, is *not* entitled to a youth offender parole hearing at any point.  (§ 3051, subd. (h), emphasis added.)

Several courts have recently contended with equal protection challenges similar to those raised by appellant.  After appellant filed his opening brief, the Fourth District Court of Appeal issued *People v. Acosta, supra*, 60 Cal.App.5th 769, which rejected an equal protection challenge to section 3051.  (*Id.* at p. 772.)  There, the defendant argued that section 3051 violated equal protection by granting future parole consideration to juveniles sentenced to LWOP but not to young adults sentenced to LWOP.  (*Id.* at pp. 777–778.)  After concluding that young-adult LWOP offenders were similarly situated to juvenile LWOP offenders (*id.* at p. 778), *Acosta* determined the Legislature had a rational basis for excluding them from parole eligibility while extending the benefit to juvenile LWOP offenders.  (*Id.* at p. 779.)  The court observed that extending section 3051 to include juvenile LWOP offenders was the result of the United States Supreme Court's decision in *Montgomery v. Louisiana* (2016) 577 U.S. 190 (*Montgomery*),[10] which would allow for compliance "without resorting to costly resentencing hearings." (*Acosta, supra*, at p. 779.)  Because *Montgomery* did not compel the same treatment of young adult offenders, age provided "a constitutionally sufficient basis for distinguishing juvenile LWOP offenders from young adult LWOP offenders."  (*Id.* at p. 780.)

---

[10]    In *Montgomery, supra*, 577 U.S. 190, the Supreme Court held that the prohibition on mandatory LWOP sentence for juveniles established in *Miller v. Alabama* (2012) 567 U.S. 460, was retroactive.  (*Id.* at pp. 206–212.) *Montgomery* provided that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."  (*Id.* at p. 212.)

Other courts have similarly rejected equal protection challenges to section 3051 and have identified rational grounds for the different treatment of young-adult LWOP offenders. In *Williams*, *supra*, 57 Cal.App.5th 427, the court explained that the Legislature reasonably could have decided that young-adult offenders who commit the crimes which have been deemed the most morally depraved to justify lifetime incarceration are still sufficiently culpable and sufficiently dangerous. (*Id.* at pp. 435–436.) In *Jackson*, *supra*, 61 Cal.App.5th 189, the court noted that the United States and California Supreme Courts "have repeatedly found the bright line drawn between juveniles and nonjuveniles to be a rational one when it comes to criminal sentencing." (*Id.* at pp. 196–197.) The *Jackson* court further noted that "public safety, and the desire to punish those persons who commit first degree special circumstance murder more harshly than persons who commit first degree murder without aggravating circumstances, provide a plausible basis for our Legislature to treat these two classifications differently for purposes of section 3051." (*Id.* at 200.) In the most recent case, *Morales*, *supra*, 67 Cal.App.5th 326, Division Four of this court echoed similar grounds in its rational review analysis in denying the defendant's equal protection challenge. (*Id.* at pp. 348–349 .)

Here, even assuming that young adult LWOP offenders and juvenile LWOP offenders are similarly situated for the purpose of section 3051, appellant's equal protection challenge fails. We cannot say that the Legislature's decision to exclude young adult LWOP offenders from the benefits of section 3051 was made without any rational basis. As discussed above, the courts in *Acosta*, *Jackson*, and *Morales* identified a number of plausible reasons why the Legislature preserved the line between juveniles and nonjuveniles with respect to eligibility for youth parole hearings. These

70

reasons apply equally to our analysis, and we likewise conclude that appellant's equal protection claim fails.

In reaching this conclusion, we acknowledge that many courts which have rejected equal protection challenges to section 3051 have expressed reservation in doing so. As the majority in *Morales* explains, "[T]he United States and California Supreme Courts have recognized that certain traits lessen a juvenile offender's culpability, and that such traits and a juvenile's capacity for reform are not 'crime-specific.' [Citations.] It is, after all, possible that a [young-adult] offender sentenced to LWOP would mature and prove suitable for release at some point during his or her incarceration, just as would a juvenile sentenced to LWOP." (*Morales*, *supra*, at p. 349; see also *Acosta*, *supra*, 60 Cal.App.5th at p. 780.) Further, in the Supreme Court's denial of a petition to review in *Jackson*, Justice Liu added a concurring statement asserting his view that section 3051's parole eligibility scheme is in tension with equal protection of the laws. (*Jackson*, *supra*, 61 Cal.App.5th at p. 202 (conc. stmt. of Liu, J.).)

Several of our colleagues have encouraged the Legislature to consider repealing the exclusion for young-adult LWOP offenders in section 3501, subdivision (h). (See *Acosta*, *supra*, 60 Cal.App.5th at p. 781; *Jackson*, *supra*, 61 Cal.App.5th at pp. 201–202 (conc. opn. Dato, J.); *Morales*, *supra*, 67 Cal.App.5th at p. 349.) In his concurring statement in *Jackson*, Justice Liu noted that at least 11 Court of Appeal justices have called for legislative reconsideration of section 3051 and again urged the Legislature to reconsider whether "our evolving knowledge of brain development" suggests that

71

"unalterable judgments" (punishments) about individuals based on what they did as young adults may be unjustifiable. (*Ibid.*)[11]

However, as *Acosta* appropriately notes, " '[e]qual protection analysis does not entitle [us] to second-guess the wisdom, fairness, or logic of the law.' " (*Acosta, supra,* 60 Cal.App.5th at p. 781.) Even though we reject appellant's equal protection challenge based on the several rational grounds for treating young-adult LWOP offenders differently from juvenile LWOP offenders, for the reasons discussed above, we join other courts in inviting the Legislature to reconsider section 3051's exclusion of young-adult LWOP offenders from eligibility to a youth parole hearing after 25 years of incarceration.

## DISPOSITION

The judgment of conviction for attempted murder is reversed as to counts 2 through 5 and the case is remanded for resentencing. The reversal does not prohibit a retrial on the attempted murder counts so long as any retrial is not based on the kill zone theory. In all other respects, the judgment is otherwise affirmed.

The trial court shall prepare an amended abstract of judgment to reflect the sentence imposed on remand or after any additional trial proceedings. The trial court is directed to forward copies of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

---

[11] More recently, in *Morales*, Justice Pollak filed a concurring and dissenting opinion setting forth the view that excluding young-adult LWOP offenders from eligibility for youth parole hearings "is fundamentally irrational and denies youthful offenders sentenced to LWOP equal protection of the law." (*Morales, supra,* at pp. 350–355 (concurring and dissenting, Pollak, J.).)

72

_____
                    Petrou, J.

WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Chou, J.[*]


*People v. Sanchez-Gomez/A156198*

_____

[*] Judge of the Superior Court of San Mateo County, assigned by the
Chief Justice pursuant to article VI, section 6 of the California Constitution.